IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

               Plaintiff,

     vs.                         No.  06-40072-01-SAC

ALBERT POWELL III,

               Defendant.

MEMORANDUM AND ORDER

The case comes before the court on defendant Albert Powell's motion to suppress (Dk. 14) to which the government has filed its response in opposition (Dk. 16). Counsel presented their arguments and evidence on October 19, 2006.  Defendant did not testify.  Having reviewed the matters submitted and having researched the relevant law, the court is ready to rule.

**Facts**

On the morning of May 16, 2006, at approximately 11:10 a.m., Shawnee County Sheriff's Deputy Tracey Trammel observed a white GMC Yukon, traveling eastbound on Interstate 70, with a group of other vehicles.  The Deputy saw the Yukon weave over the fog line on two

separate occasions within a quarter of a mile and did not notice any other vehicles having any difficulty remaining on the road.  As there were no road, weather, or traffic conditions to explain the weaving, Deputy Trammel stopped the Yukon for violating K.S.A. § 8-1522, failure to maintain a single lane of traffic.

After identifying himself as Albert Powell, III, the defendant driver was told that he was stopped for "hitting the white line."  The Deputy inquired if he had consumed alcohol or was tired.  Defendant responded negatively to both questions and denied that he had crossed the white line.  Defendant then volunteered a narrative about his travel plans.  He stated that he was using a rented vehicle to move from Colorado to Lexington, Kentucky to establish a clothing business and would return the rental vehicle to Colorado.  Defendant further volunteered that he was transporting some tires that belonged to a suburban that he owned in Colorado.  The tires, according to defendant, were only suitable for off-road use and thus needed to be stored off the vehicle while traveling on a highway.  Defendant stated that he planned to unload the tires in Lexington before returning to Colorado to pick up his suburban.  Defendant also explained that his brother was traveling "up ahead,"

because he had not waited for defendant while defendant stopped to use the restroom.

At this point, Deputy Trammel asked defendant to produce his license and rental agreement.  While defendant was fumbling for his paperwork, Deputy Trammel noticed the four large tires that defendant spoke of and several boxes laying in the back cargo area of the automobile.  Deputy Trammel also noticed a strong masking odor wafting from the vehicle.  As defendant handed Deputy Trammel his driver's license, the deputy noticed that defendant was breathing heavily and his hands were shaking.  During their conversation, defendant also avoided eye contact with the deputy.

Deputy Trammel returned to his patrol car to conduct a license check and review the rental agreement. The rental agreement indicated that defendant had rented the vehicle on May 15, 2006, and needed to return it three days later.  The trooper believed that the rental was "not going to be very long" and that the trip was "way too quick" to accommodate defendant's stated travel plans.  By this time, the trooper had delayed defendant for approximately fifteen minutes.

Deputy Trammel then approached defendant's vehicle, leaned

3

into the passenger window, returned defendant's documents, and issued

him a warning citation for the lane violation.  The deputy thanked

defendant, visibly shifted his balance, briefly paused, then leaned back

into the passenger window of the vehicle and inquired if defendant would

answer a few additional questions.  There is a dispute over whether or not

defendant agreed.

The deputy followed up by asking whether defendant was

transporting anything illegal.  Looking down at the vehicle floor rather than

at the deputy, defendant answered, "no."  Defendant then refused the

deputy's request to search the vehicle.  Deputy Trammel related to

defendant his aroused suspicion about the need to drive a rental vehicle

all the way to Kentucky with only minimal belongings for the stated

purpose of moving from Colorado to Kentucky.  When Trammel explained

this basis for his request, defendant still indicated that he had "a reason"

for declining the search and that he wanted to resume his travels.

Believing he had reasonable suspicion that defendant was

involved in the trafficking of illegal narcotics, Deputy Trammel detained

defendant and used his canine to conduct a sniff search of the Yukon's

exterior.  The dog alerted to the presence of narcotics in the front portion

4

of the vehicle.  At this time, dispatch advised that defendant had been previously arrested for conspiracy to distribute methamphetamine.  Again, Deputy Trammel asked defendant if he was taking part in any illegal behavior and again defendant denied it.  Trammel then asked a second time if defendant had ever previously been arrested.  Again defendant stated "no."  However, this time defendant asserted his intention to travel to Louisville, a contradiction with his earlier statement of his travel plans. Deputy Trammel then searched the rental vehicle finding marijuana in boxes labeled with the initials "AP."

**Initial stop**

Defendant first challenges Deputy Trammel's justification for stopping defendant for violating K.S.A. § 8-1522.  In deciding the validity of the initial stop, the court looks at whether it was "objectively justified." *United States v. Botero-Ospina*, 71 F.3d 783, 788 (10th Cir. 1995) *(en banc), cert. denied*, 518 U.S. 1007 (1996).  To be reasonable under the Fourth Amendment, "a law enforcement officer 'must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping an automobile.'"  *United States v. Alvarado*, 430 F.3d 1305, 1308 (10th Cir. 2005) (quoting *United States v. Cervine*, 347

5

F.3d 865, 869 (10th Cir. 2003)).  The constitutional reasonableness of a

traffic stop does not depend on the officer's actual motive in conducting

the stop.  *Whren v. United States*, 517 U.S. 806, 812-13, 116 S. Ct. 1769,

135 L. Ed. 2d 89 (1996).  "Thus, 'when evaluating the reasonableness of

the initial stop of a vehicle, our sole inquiry is whether this particular officer

had reasonable suspicion that this particular motorist violated any one of

the multitude of applicable traffic and equipment regulations of the

jurisdiction.'"  *Alvarado*, 430 F.3d at 1308 (quoting *United States v.

Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003)).  "This standard expressly

leaves to 'the state legislatures the task of determining what the traffic

laws ought to be, and how those laws ought to be enforced.'"  *United

States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (*quoting Botero-

Ospina*, 71 F.3d at 787).

        The Tenth Circuit recently summarized the law relevant to the

reasonable suspicion standard to be applied in the context of traffic stops:

> Reasonable suspicion requires that an officer provide "some minimal
> level of objective justification."  *I.N.S. v. Delgado*, 466 U.S. 210, 217,
> 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984).  However, an officer with
> reasonable suspicion need not "rule out the possibility of innocent
> conduct" as long as the totality of the circumstances suffices to form
> "a particularized and objective basis" for a traffic stop.  *United States
> v. Arvizu*, 534 U.S. 266, 277-78, 122 S. Ct. 744, 151 L. Ed. 2d 740
> (2002) (citation omitted).  Moreover, reasonable suspicion may be

supported by an "objectively reasonable" good faith belief even if premised on factual error.  *See United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989) (quotation omitted). Finally, reasonable suspicion may rely on information less reliable than that required to show probable cause, *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990), and it need not be correct.  *See United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (upholding a traffic stop based on a reasonable articulable suspicion that a cracked windshield substantially obstructed the driver's view–the standard required by statute–regardless of whether or not the crack actually constituted a violation of the law); *United States v. Allegree*, 175 F.3d 648, 650 (8th Cir. 1999) (upholding a traffic stop based on the mistaken, yet reasonable, belief that defendant had illegal headlights).

*Vercher*, 358 F.3d at 1261.

The pertinent traffic statute states:  "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  K.S.A. § 8-1522.  Thus, the narrow issue before the court is whether Deputy Trammell had objectively reasonable suspicion that the rental vehicle was not being "operated as nearly as practicable entirely within a single lane" when taking into consideration the size and profile of the vehicle, the road, weather, and traffic conditions.

In *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996), the court considered whether a traffic stop of a truck for failure to maintain a single lane was reasonable when the truck "briefly crossed into the right

7

shoulder emergency lane" where "[t]he road was winding, the terrain mountainous and the weather condition was windy." 79 F.3d at 978. The court found the stop unreasonable because the driver had complied with the statutory duty to drive in a single lane "as nearly as practical" as the particular weather and road conditions were such that "any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity." *Id*. The Tenth Circuit has clarified in subsequent decisions that *Gregory* does not create a rule that exempts a single act of drifting onto the shoulder from traffic laws, but it does emphasize the court's "need to analyze objectively all the surrounding facts and circumstances to determine whether the officer had the probable cause necessary to justify the stop." *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999) (upholding probable cause when the motor home drifted twice "onto the shoulder within a quarter mile under optimal road, weather and traffic conditions."); *see United States v. Alvarado*, 430 F.3d at 1308 (upholding reasonable suspicion when Jeep Cherokee crossed over fog line once and there were no objective factors, like weather or road conditions, that "might have made it impractical . . . to remain in a single lane."); *United States v. Cline*,

8

349 F.3d 1276, 1285-87 (10th Cir. 2003) (upholding articulable suspicion when pickup crossed shoulder line one time and there was no proof that wind or other conditions caused the pickup to swerve); *United States v. Rodriguez*, 215 F.3d 1338, 2000 WL 639581 (10th Cir. May 18, 2000) (upholding probable cause where car swerved onto shoulder twice under windy conditions and concluding "that the windy weather conditions alone in this case do not distinguish it from *Ozbirn.*"); *United States v. Egan*, 2006 U.S. Dist. LEXIS 61305 (D. Kan. 2006) (unpublished opinion) (officer had reasonable suspicion for stopping rental truck despite presence of "gusting wind").  The court's role is not to decide whether the facts are sufficient to sustain a conviction under the K.S.A. § 8-1522, but whether they "are adequate to form an objectively reasonable suspicion that" the rental van was being operated in violation of this statute. *Vercher*, 358 F.3d at 1260.  This is "a context-specific inquiry to evaluate whether the historical facts, 'viewed from the standpoint of any objectively reasonable police officer,' *Ornelas*, 517 U.S. at 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911, establish a minimal basis for reasonable suspicion." *Id.* at 1262.

Defendant primarily bases his argument that he complied with K.S.A. § 8-1522 on the fact that Deputy Trammel indicated that he

stopped defendant for merely "hitting the white line."  Defendant also

highlights the fact that he responded to Deputy Trammel's statement by

disputing having crossed this line at any time.   The court does not find

these contentions persuasive.  Deputy Trammel testified that he may have

used the phrase "hitting the white line" as a conversational "misuse of

words" to establish a positive rapport with the defendant.  Deputy Trammel

further stated, "I don't stop vehicles for hitting the line; I stop vehicles for

crossing the line."  Further, as noted in his police report, Deputy Trammel

explained that he observed defendant's vehicle clearly cross the fog line.

The court finds Deputy Trammel's testimony to be both credible and

uncontradicted and accepts Deputy Trammel's testimony concerning

defendant's suspicious driving behavior.[1]

       Additionally, no weather or road conditions existed to help

explain defendant's driving.  In contrast to the mountainous roads in

*Gregory*, the road here was neither sloping nor winding.  Instead, it was a

typical straight and flat Kansas road.  Further, no weather conditions

hindered defendant's ability to control his vehicle.  Although there was a

slight breeze, this is distinguishable from the windy conditions inherent in

---

[1] The court does not reach the issue of whether a vehicle driving on
but not over the line constitutes a violation of K.S.A. § 8-1522.

*Gregory*.  Additionally, as Deputy Trammel testified, no other vehicles appeared to have any difficulty in keeping their vehicles safely on the road. With these facts in mind, the court finds the record does not support an inference that road, traffic, or weather conditions contributed to defendant's inability to keep his vehicle from weaving.  Based on all the factors discussed above, this court concludes that a reasonable officer placed in Deputy Trammel's situation would have had an objectively reasonable suspicion for stopping defendant's vehicle for violating K.S.A. § 8-1522.

**Detention**

The court next addresses the contention that at the time the initial stop terminated, Deputy Trammel lacked reasonable suspicion to detain defendant for the purpose of asking further questions.[2]  The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable."  *Wilson v. Arkansas*, 514 U.S. 927, 931, 115 S.

---

[2] Defendant does not challenge the length of the stop.

11

Ct. 1914, 131 L. Ed. 2d 976 (1995) (quotation omitted).  A routine traffic stop is analogous to an investigative detention and is analyzed under the principles enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001).  The court undertakes a two-step inquiry to determine the constitutionality of an investigative detention.  First, it determines whether the police officer's action was justified at its inception.  *Terry*, 392 U.S. at 20; *Caro*, 248 F.3d at 1244.  Second, it considers whether the action was reasonably related in scope to the circumstances which justified the interference in the first place.  *Id.*

         "An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."  *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).  During a routine traffic stop, a police officer may request a driver's license and vehicle registration, run a computer check, and issue a citation as a matter of course.  *Id.*; *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995).  Moreover, an officer may ordinarily ask questions relating to a driver's travel plans without exceeding the scope

of a traffic stop. *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).  The officer may even go further, inquiring into matters unrelated to the stop.  *Muehler v. Mena*, 544 U.S. 93, 101 (2005).  "Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage."  *Id.* (*quoting Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). The officer may also obtain information regarding the detainee's criminal history.  *United States v. McRae*, 81 F.3d 1528, 1536 n.6 (10th Cir. 1996).  "When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."  *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994).  Thus, after completing these activities, an officer may continue to detain a driver only if: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the detention has become a consensual encounter.  *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

If a continued detention is based on a reasonable suspicion

13

of illegal activity, the court must consider the totality of the circumstances. *Arvizu*, 534 U.S. at 266; *United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005). Factors that suggest innocent travel plans if considered separately, may contribute to reasonable suspicion under a totality of the circumstances inquiry. *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989). Thus, it is the court's role to consider all factors, the patently innocent and the overtly incriminating, in guiding a reasonable articulable suspicion analysis.

At the time Deputy Trammel terminated the initial stop, a number of objective factors provided Deputy Trammel's suspicion that criminal activity was afoot. First, defendant appeared nervous. This fact is not disputed. Defendant was shaking, breathing heavily, and avoided eye contact with Deputy Trammel. Defendant further rambled about his travel itinerary without any provocation from the officer. Deputy Trammel testified that it is unusual for someone during a traffic stop to volunteer a narrative without any encouragement from the officer. Defendant's willingness to do so thus added to Deputy Trammel believing that defendant was nervous. Further, Deputy Trammel testified that defendant continued to act nervous *after* Trammel handed

14

back his driver's license, issued a mere warning, and effectively

terminated the stop.  As Deputy Trammel explained, in his experience

any anxiety manifested by most drivers subsides upon the completion of

a traffic stop.  Deputy Trammel was a trained, experienced narcotics

officer who had conducted traffic stops for over ten years.   His

conclusion that defendant's nervousness was extreme and prolonged is

a legitimate factor, although not a strong one, in the reasonable

suspicion analysis.  *See, e.g., Williams*, 271 F.3d at 1269.

Second, Deputy Trammel noticed a strong "masking odor" in

the vehicle.  As the Tenth Circuit has held, such a smell is consistent

with an attempt to hide the odor of illegal drugs.  *See, e.g., Ozbirn*, 189

F.3d at 1200.  The fact that a deodorizer was being used in a rental

vehicle added to Deputy Trammel's suspicions.  Deputy Trammel found

it unusual that a person "would spend the money to deodorize" a vehicle

he had "just rented."

Additionally, "unusual travel plans may provide an indicia of

reasonable suspicion."  *Wood*, 106 F.3d at 946-47; *see Sokolow*, 490

U.S. at 9; *United States v. Douglas*, 2006 U.S. App. LEXIS 23671 (10th

Cir. 2006) (unpublished opinion).  Deputy Trammel had a host of

reasons to be suspicious about defendant's stated plans to move to Lexington from Colorado.  Given the fact that such a trip would take approximately 40 hours of driving, it would be difficult for defendant to make the trip, unload his vehicle, and return the rented car within the allocated three-day period.  Moreover, the  defendant did not have sufficient luggage to suggest any clothes or other items were being transported.  The vehicle was loaded with only four tires and a few small boxes.  It would be quite unusual for someone moving to another state to rent a large vehicle for that purpose, but not pack it fully with belongings.  Defendant's account is made all the more implausible in light of defendant's explanation that he owned a large vehicle which remained in Colorado and for which the tires were being transported.

Finally, Deputy Trammel testified that it was somewhat unusual that two drivers making a cross country trip together in separate vehicles would not travel immediately in view of each other.  Defendant indicated to Deputy Trammel that his brother was "up ahead" but had chosen not to wait for defendant after defendant pulled over for a restroom break.

In short, it made little sense for someone to incur the

16

expense of a costly and long road trip and the physical hardship of driving this distance and back in three days in order to transport cargo seemingly unworthy of such a trip.  The inconsistencies and implausibilities of defendant's travel plans, in combination with all the other circumstances, furnished Deputy Trammel with reasonable suspicion justifying the additional questions asked about the travel plans and the illegal cargo, and the detention for a dog sniff.[3]  The court does not reach the government's argument that Deputy Trammel established a consensual encounter, justifying the additional questioning even absent reasonable suspicion.

IT IS THEREFORE ORDERED that defendant's motion to suppress evidence (Dk 14) is denied.

Dated this 21st day of November, 2006, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

---

[3]*Williams*, 271 F.3d at 1271, *cert. denied*, 535 U.S. 1019, (2002).